Matter of Richardson-Vargas (2026 NY Slip Op 00019)

Matter of Richardson-Vargas

2026 NY Slip Op 00019

Decided on January 06, 2026

Appellate Division, First Department

Per Curiam 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

 
Motion No. 2025-04989|Case No. 2025-05567|

[*1]In the Matter of Janet Lindsay Richardson-Vargas, an Attorney and Counselor-at-Law: Attorney Grievance Committee for the First Judicial Department, Petitioner, Janet Lindsay Richardson-Vargas (OCA Atty. Reg. No. 4744975), Respondent.

Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent, Janet Lindsay Richardson-Vargas, was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the First Judicial Department on July 27, 2009.

Jorge Dopico, Chief Attorney,
Attorney Grievance Committee, New York City
(Brian Shulman, of counsel), for petitioner.
Respondent, pro se.

Per Curiam 

Respondent Janet Lindsay Richardson-Vargas was admitted to the practice of law in the State of New York by the Appellate Division, First Judicial Department on July 27, 2009. As the admitting Judicial Department, this Court retains continuing jurisdiction over respondent (Rules for Atty Disciplinary Matters [22 NYCRR] § 1240.7[a][2]). Respondent practiced federal immigration law in Colorado and maintained a registered business address in the state.
On September 16, 2024, the Office of Attorney Regulation Counsel (OARC) of the Supreme Court of Colorado (SCCO) filed a complaint with the presiding disciplinary judge (PDJ) of the SCCO.[FN1] The OARC's complaint alleged that respondent violated 11 rules of the Colorado Rules of Professional Conduct (CRPC) by abandoning multiple vulnerable immigration clients, comingling personal and client funds in her attorney trust account for almost four years, and falsifying bank records to conceal her misuse of her trust account. The relevant facts are as follows.
In October 2018, respondent entered into a retainer agreement with client B.E. and his wife, E.S., where they would pay respondent a flat fee of $4,000 for "U-Visa and Adjustment of Status" services. B.E. sought a U-Visa because he had been the victim of a crime in another state, and E.S. sought to adjust her status. Between October 2018 and October 2019, the couple paid respondent a total of $2,400 in six installments. However, respondent never deposited these payments into a trust account, as is required by CRPC 1.15A(a), even though she had not earned all the funds when she received them. Further, she did not file any documents with immigration authorities on behalf of B.E. or E.S.
Around fall 2021, B.E. and E.S. terminated respondent's representation and asked that she return their money. However, respondent refused to refund them, contending that she had earned the money. In fall 2021 and early spring 2022, B.E. and E.S. tried to get in touch with respondent multiple times to retrieve their file and get a refund, but respondent did not respond to their efforts to contact her. In March 2022, respondent finally sent B.E. and E.S. their file. When the couple received their file, they discovered that respondent never filed B.E.'s U-Visa petition.
In a separate matter, respondent orally agreed in September 2017 to file an I-601A application for a provisional unlawful presence waiver on behalf of client A.G., who entered the United States without inspection and whose spouse had filed a petition for him to obtain lawful permanent residence status. Because A.G. was not inspected when he entered the U.S., he was required to return to his home country and could be barred from re-entry for 10 years. Under the agreement, A.G. was to pay respondent a flat fee of $2,500, plus $1,160 for the filing fee. A.G. paid respondent $2,620 in installments to file the I-601A application. However, respondent once again did not deposit the payments into her trust account, even though she had not earned the funds when she received them. In fact, she made no deposits into her trust account in September, October, or December 2017.
In August 2018, respondent submitted A.G.'s waiver application. While immigration authorities normally issue a receipt notice within a month or two after an application is filed, respondent did not receive a receipt herself. Not until March 2020 did she confirm whether A.G. received a receipt. Respondent did not reach out to immigration authorities about the status of A.G.'s application until June 2021. On July 24, 2021, respondent received a response from immigration authorities stating that A.G.'s case was delayed and in line for processing and adjudication.
On September 4, 2021, respondent was notified that due to the amount of time that had passed since the original application was submitted, A.G. was required to pay the visa application fees again. However, respondent did not notify A.G. that he needed to pay an additional application fee. Respondent received two additional notices about the required fees, but each time, she failed to alert A.G. Because A.G. did not pay the required fee, the waiver application was returned to respondent in summer or fall 2021. Respondent still did not notify A.G. that his application had been returned. Unaware that his waiver application had been returned, A.G. terminated respondent's representation and requested his file from respondent. Respondent did not respond to A.G.'s request or return his file, and even though respondent failed to complete the representation, as A.G.'s application was rejected, she did not refund A.G.'s advance fee.
In yet another matter, L.R. hired respondent in 2019 to help her seek permanent residency (i.e., a "green card") and a work permit. Respondent agreed to complete the work on a flat-fee basis, but she did not provide L.R. with a written agreement or otherwise communicate the basis for her fee in writing. L.R. paid respondent $2,400 in installments. Again, respondent failed to deposit these payments into her trust account, even though she had not earned the funds when she received them. L.R. also paid respondent roughly $700 for the work permit filing fee.
Respondent advised L.R. to pursue a green card via an application for victims of domestic violence under the Violence Against Women Act (VAWA). On L.R.'s behalf, respondent filed a VAWA and lawful permanent residency application with a fee waiver request in May 2021. However, respondent failed to include the required criminal background check with the application. Nor did respondent file an application for a work permit at that time, despite L.R. believing that respondent had done so. Respondent subsequently failed to respond to L.R.'s attempts to get in touch with her over the course of several months at the end of 2021 and beginning of 2022. Then, in March 2022, respondent lied to L.R. and told L.R. that she had filed L.R.'s criminal background check.
Later that month, L.R. requested an update on her work permit, and respondent again did not answer. In April 2022, L.R. emailed respondent that she would "file a fraud case" against respondent for taking her money without performing any work on her case. That month, L.R. also asked respondent to return her file. However, respondent never responded to L.R.'s request or returned her file. Nor did respondent refund L.R. any of the unearned flat fee that L.R. had paid her. L.R. never received the notice that her application was deficient due to the missing criminal background check. It was not until L.R. sought help with her case from Colorado Legal Services that she learned that the notice of her deficient application had been sent to respondent and that respondent had never filed a work permit application on her behalf.
Additionally, as it relates to respondent's misuse of her attorney trust account, although respondent opened a trust account and a business checking account with Chase Bank in November 2017, her trust account contained no funds from November 2017 to October 2020. During that period, she deposited unearned client funds into her business checking account and transferred funds between her business checking account and her personal account. Then, from October 2020 to as late as May 2023, respondent used her trust account as her personal bank account and as her business account to run her law office and pay business expenses.
In 2022, Chase Bank notified the OARC that respondent's trust account was overdrawn. During the OARC's investigation into the matter, respondent sent the OARC what she represented were copies of her actual trust account bank statements for the months of December 2021, January 2022, and February 2022. However, respondent had altered the statements in order to hide her misuse of her trust account. The trust account statements that respondent exchanged with the OARC differed materially from the statements that the OARC received after subpoenaing the bank.
Respondent failed to answer the OARC's September 16, 2024 complaint, and on December 13, 2024, the PDJ granted the OARC's motion for default, deeming all allegations and claims in the complaint admitted. The PDJ issued a "Notice of Sanctions Hearing" on December 19, 2024, advising respondent of her right to attend, be represented by counsel at her own expense, cross-examine witnesses, and present arguments and evidence regarding the appropriate sanction. On January 29, 2025, the PDJ held a sanctions hearing, for which respondent failed to appear.
On March 4, 2025, the PDJ issued an opinion disbarring respondent from the practice of law in Colorado and ordering her to pay restitution to her clients in the amount of $8,120. The PDJ stated that "[r]espondent's abandonment of her clients, coupled with her knowing conversion of their funds and her dishonesty when dealing with regulatory authorities, demonstrates that she is unregulatable and poses a significant danger to Colorado citizens." The PDJ found, as established on default, that respondent's conduct during her client matters violated nine rules of the CRPC [FN2] and that her conduct with respect to her trust account violated three rules of the CRPC.[FN3] The PDJ found the following in aggravation: respondent's repeated pattern of misconduct in three different client matters; her commission of multiple offenses; her bad faith obstruction of the disciplinary proceeding, based on her falsification of records to cover up her conversion of client funds; her refusal to acknowledge the wrongful nature of her conduct, based on her failure to participate in the disciplinary proceeding, communicate with her clients, and return their property; the vulnerability of her victims;[FN4] and her indifference to making restitution, as respondent failed to return her clients' property, including their files and funds, even after she was put on notice of the disciplinary proceeding. In mitigation, the PDJ found that respondent had not been disciplined in Colorado and there was no evidence that she had been disciplined in any other jurisdiction.
On April 8, 2025, the PDJ issued an order and notice of respondent's disbarment based on his March 4, 2025 opinion imposing sanctions. Respondent did not notify this Court or the Attorney Grievance Committee (AGC) of her Colorado disbarment, as required by 22 NYCRR 1240.13(d). Instead, the AGC learned of respondent's disbarment in Colorado from a legal news publication.
By order dated July 11, 2025, the U.S. Department of Justice's Board of Immigration Appeals (BIA) imposed reciprocal discipline based on respondent's disbarment in Colorado, disbarring her from practice before the BIA, Immigration Courts, and the Department of Homeland Security, effective nunc pro tunc to May 2, 2025, the date of her interim suspension. Respondent failed to file an answer in the reciprocal disciplinary matter before the BIA.
The AGC now seeks an order from this Court, pursuant to the doctrine of reciprocal discipline as set forth in 22 NYCRR 1240.13 and Judiciary Law § 90(2), disciplining respondent, predicated on the disbarment imposed by the SCCO, and directing her to demonstrate to this Court why discipline should not be imposed in New York for the underlying misconduct in the form of a reciprocal disbarment, or, in the alternative, sanctioning respondent as this Court deems just and proper under the circumstances.
"In a proceeding seeking reciprocal discipline pursuant to 22 NYCRR 1240.13, respondent may raise the following defenses: (1) a lack of notice and opportunity to be heard in the foreign jurisdiction; (2) an infirmity of proof establishing the misconduct; or (3) that the misconduct at issue in the foreign jurisdiction would not constitute misconduct in New York" (Matter of Milara, 194 AD3d 108, 110 [1st Dept 2021]).
Respondent does not assert any of the enumerated defenses in her response to the AGC's motion. Regardless, none apply. First, respondent was given proper notice and had an opportunity to answer the allegations in the Colorado disciplinary proceedings but defaulted. Second, a review of the record establishes that there was no infirmity of proof. Respondent's misconduct was investigated and litigated before the SCCO, and the properly pleaded allegations and claims in the complaint were deemed admitted upon her default pursuant to CRCP 242.27(a). Respondent further admitted to her misconduct in her response to the AGC's motion. Third, the misconduct for which respondent was disciplined in Colorado would constitute misconduct in New York in violation of Rules of Professional Conduct (22 NYCRR 1200.0) rules 1.3(a), 1.3(b), 1.4(a)(3), 1.4(a)(4), 1.15(a), 1.15(b), 1.16(e), and 8.4(c). Accordingly, because no defense can prevail, the imposition of reciprocal discipline is appropriate and the only issue that remains is what sanction to impose.
With respect to the sanction, in reciprocal disciplinary proceedings, this Court's general rule is that "significant weight should be given to the sanction imposed by the jurisdiction where the misconduct occurred because the foreign jurisdiction has the greatest interest in fashioning sanctions for misconduct" (Matter of Blumenthal, 165 AD3d 85, 86 [1st Dept 2018], citing Matter of Jaffe, 78 AD3d 152 [1st Dept 2010]). "Only in rare instances will this Court depart from its general rule" (Matter of Tustaniwsky, 204 AD3d 162, 165 [1st Dept 2022]).
Thus, disbarment, as requested by the AGC, is the appropriate sanction, as it is commensurate with the discipline imposed in Colorado, is warranted given the seriousness of respondent's misconduct, and generally accords with this Court's precedent in cases involving comparable misconduct (see Matter of Rogan, 208 AD3d 22 [1st Dept 2022]; Matter of Toback, 199 AD3d 99 [1st Dept 2021]; Matter of Simons, 34 AD3d 136 [1st Dept 2006]).
Accordingly, the AGC's motion for reciprocal discipline should be granted, respondent disbarred, and her name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective immediately.
All concur.
Wherefore, it is Ordered that the motion by the Attorney Grievance Committee for the First Judicial Department for reciprocal discipline, pursuant to Judiciary Law § 90(2) and 22 NYCRR 1240.13, is granted, and respondent, Janet Lindsay Richardson-Vargas, is disbarred and her name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective immediately, and until further order of this Court; and
It is further Ordered that, pursuant to Judiciary Law § 90, respondent, Janet Lindsay Richardson-Vargas, is commanded to desist and refrain from (1) the practice of law in any form, either as principal or agent, clerk or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding herself out in any way as an attorney and counselor-at-law; and
It is further Ordered that, respondent, Janet Lindsay Richardson-Vargas, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), which are made part hereof; and
It is further Ordered that if respondent, Janet Lindsay Richardson-Vargas, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith.
Entered: January 6, 2026

Footnotes

Footnote 1: Although respondent was not admitted to practice law in Colorado, Colorado Rules of Civil Procedure (CRCP) rule 242.1(a)(2) conferred jurisdiction over respondent by virtue of her practicing federal immigration law in the state.

Footnote 2: CRPC 1.3 (requiring that a lawyer act with reasonable diligence and promptness in representing a client), 1.4(a)(3) (requiring that a lawyer keep a client reasonably informed about the status of the client's matter), 1.4(a)(4) (requiring that a lawyer comply with a client's reasonable requests for information), 1.5(b) (requiring that a lawyer inform a client in writing about the lawyer's fees and expenses within a reasonable time after being retained if the lawyer has not regularly represented the client), 1.5(f) (prohibiting a lawyer from earning fees until a benefit is conferred on a client or the lawyer performs a legal service), 1.5(h)(1) (effective January 31, 2019 to December 31, 2021) (requiring that a lawyer communicate the terms of a flat fee in writing before or within a reasonable time after commencing representation), 1.15A(a) (requiring that a lawyer hold client funds in a trust account and hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property), 1.16(d) (requiring that a lawyer protect a client's interests upon termination of representation), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Footnote 3: CRPC 1.15A(a), 8.1(a) (prohibiting a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter), and 8.4(c).

Footnote 4: On this factor, the PDJ noted that "[u]ndocumented immigration clients are generally considered the epitome of vulnerable victims."